UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAUREEN WEEKS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil No. 14-30097-MGM |
| LOWER PIONEER VALLEY | * | |
| EDUCATIONAL COLLABORATIVE, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S
MOTION TO STRIKE SUR-REPLY
(Dkt. Nos. 27, 49)

February 19, 2016

MASTROIANNI, U.S.D.J.

## I.   INTRODUCTION

Maureen Weeks ("Plaintiff") brings this action for age discrimination against Lower Pioneer

Valley Educational Collaborative ("Defendant"), a provider of special education programs to

students from various school districts. Plaintiff was hired by Defendant as a Special Education

Nurse on August 20, 2013 and was terminated on November 5, 2013. At the time of both her hiring

and her dismissal, Plaintiff was 61 years old. Plaintiff's specific claims are for age discrimination in

violation of the Age Discrimination in Employment Act ("ADEA") and Chapter 151B of the

Massachusetts General Laws ("Chapter 151B") (Counts I and IV), age harassment in violation of the

ADEA and Chapter 151B (Counts II and V), and retaliation in violation of the ADEA and Chapter

151B (Counts III and VI). Following discovery, Defendant filed the instant motion for summary

judgment. Prior to the hearing on summary judgment, Plaintiff filed a sur-reply memorandum that

Defendant sought to strike. For the following reasons, the court denies Defendant's motion to strike, denies Defendant's motion for summary judgment on Plaintiff's discrimination claims in Counts I and IV, and allows Defendant's motion for summary judgment with respect to Plaintiff's harassment and retaliation claims in Counts II, III, V, and VI.

## II.   FACTS[1]

Plaintiff interviewed for a position as a Special Education Nurse with Anne McKenzie, Defendant's former Executive Director, on August 20, 2013. (Dkt. No. 29, Def.'s Statement of Facts ("Def. SOF") ¶¶ 18-19.) Plaintiff was one of two finalists recommended by a committee comprised of Defendant's Special Education Supervisors Marisa Ross, Judith Kelliher, and Yvette Stoddard (f/k/a Yvette Dunn). (Id. ¶¶ 11-17.) Plaintiff asserts that, during the interview, Ms. McKenzie asked, in reference to Plaintiff's age, why she wanted to work for the Defendant. (Dkt. No. 37, Pl.'s Statement of Facts ("Pl. SOF") ¶ 88.) Ms. McKenzie denies having done so. (Dkt. No. 40, Def.'s Reply Statement of Facts ("Def. Reply SOF") ¶ 88.) Plaintiff also claims that Ms. McKenzie made a comment that, given her age, this would probably be Plaintiff's last job. (Pl. SOF ¶ 89.) Ms. McKenzie also denies this. (Def. Reply SOF ¶ 89.) Ms. McKenzie offered Plaintiff the position during their interview, and Plaintiff accepted on the spot. (Def. SOF ¶¶ 18-19.) Plaintiff was 61 years old when she was hired on August 20, 2013. (Id. ¶ 20.)

Defendant provides special education programs to students with behavioral problems and learning disabilities. (Id. ¶¶ 1-2.) Plaintiff was assigned to work at Defendant's Twain building. (Pl. SOF ¶ 94.) Plaintiff's duties included maintaining health records, attending field trips, dispensing medications to students, and otherwise providing health care to students. (Def. SOF ¶¶ 10, 22; Pl. SOF ¶ 22.)

---

[1] Except where noted, the parties do not dispute the following facts, which are construed in the light most favorable to Plaintiff, the nonmoving party.

Plaintiff was also responsible for managing and supervising Melanie Beck (f/k/a Melanie Feinberg), Defendant's Certified Nursing Assistant, with whom she shared an office. (Def. SOF ¶ 23.) Plaintiff asserts that Ms. Beck began making age-related comments within the first week of her employment, such as stating that Plaintiff was too old for the position, that Plaintiff was as old as Ms. Beck's mother, and that Plaintiff should not be working and should be retired. (Pl. SOF ¶¶ 103-05.) Ms. Beck denies having made these or other age-related comments. (Def. Reply SOF ¶¶ 103-05.) During the first few weeks of her employment, Plaintiff attempted to contact Ms. McKenzie to complain about Ms. Beck's age-related comments, but was unable to speak with Ms. McKenzie because she was not in her office. (Pl. SOF ¶¶ 119-22.) Plaintiff did not leave a message with Ms. McKenzie's secretary, nor did she leave Ms. McKenzie a voicemail, "because she considered the matter private." (*Id.* ¶¶ 123-24.) Plaintiff would occasionally encounter Ms. McKenzie and say hello, but did not bring up her complaints during these encounters. (Def. Reply SOF ¶ 122.)

Plaintiff was supervised more or less equally by Ms. Ross, Ms. Kelliher, and Ms. Stoddard. (Def. SOF ¶ 24.) Ms. Kelliher began documenting concerns with Plaintiff's performance at least as early as September 9, 2013, when she noted that Plaintiff's computer skills were "not great," that Plaintiff "seems easily distracted by anything," and that setting priorities was a "big issue" for her. (*Id.* ¶ 25.) Ms. Kelliher later noted on September 19, 2013, that there were concerns regarding Plaintiff's interactions with parents and teachers, her failure to familiarize herself with students before a field trip, and "very obvious errors" in the preparation of Individualized Health Care Plans ("IHCPs"). (*Id.* ¶ 26.) Plaintiff disputes the factual accuracy of these notes, stating that she was performing her responsibilities well, but does not dispute the notes' existence. (Pl. SOF ¶¶ 25-26.) Ms. Kelliher and Ms. Stoddard addressed their concerns in a meeting with Plaintiff (and her subordinate, Ms. Beck) on September 19, 2013. Cheryl Wiblyi (f/k/a Cheryl Decoteau), Defendant's Director of Human Resources, was also present. (Def. SOF ¶ 27.) Plaintiff disputes this account

insofar as she claims she was preparing the IHCPs "as expeditiously as possible" given that they were in "absolute disarray" upon her hire. (Pl. SOF ¶ 27.)

Plaintiff states that, in "probably the second week or third week of September," Ms. Kelliher made comments expressing surprise that Plaintiff still had her nursing license at her age and suggesting that Plaintiff was too old to do that type of work. (Pl. SOF ¶¶ 112-13.) Ms. Kelliher denies having made such comments. (Def. Reply SOF ¶¶ 112-13.) Ms. Kelliher was in the process of retiring at this time and claims that she did respond to general questions from Plaintiff about the retirement process. (Def. SOF ¶ 73.) Plaintiff disputes this characterization of the events. (Pl. SOF ¶ 73.) Plaintiff also claims that, "around the first week of October," Ms. Ross made a comment that Plaintiff would "probably be retiring soon anyways." (*Id.* ¶ 118.) Ms. Ross denies having done so. (Def. Reply SOF ¶ 118.)

Plaintiff states that, also in the first week of October, she spoke to Ms. Wiblyi about the age-related comments and her desire to make a complaint. Plaintiff alleges that, during this conversation, Ms. Wiblyi made age-related comments along the lines that Plaintiff was "probably too old to be working [for Defendant] anyway" and that Ms. Wiblyi was "surprised" Plaintiff was still working at her age. (Pl. SOF ¶¶ 107-10.) Ms. Wiblyi denies having made any of these comments. (Def. Reply SOF ¶¶ 107-10.) Plaintiff claims that she followed up with Ms. Wiblyi to see if Ms. Wiblyi would file a complaint on her behalf. Plaintiff alleges that Ms. Wiblyi said that they were "not going to do anything about this right now" and that Plaintiff was "old and stuck in her ways." (Pl. SOF ¶ 129.) Ms. Wiblyi denies making these statements and further denies that Plaintiff ever complained to her about age-related comments. (Def. Reply SOF ¶ 129.) Also in the first week of October, Plaintiff claims she spoke with Anna Bishop, Defendant's CFO, to complain about the alleged age-related comments. Plaintiff asserts that Ms. Bishop told her, "that's the way it is here." (Pl. SOF ¶¶ 125-26.)

Ms. Bishop denies ever having discussed age-related comments with Plaintiff. (Def. Reply SOF ¶¶ 125-26.)

Ms. Kelliher and Ms. Wiblyi met with Plaintiff and Ms. Beck on October 3, 2013. The subjects of the meeting were the need for Plaintiff to be more careful in preparing IHCPs and Plaintiff's ability to supervise Ms. Beck. Plaintiff and Ms. Beck had had numerous disagreements and difficulties working together. (Def. SOF ¶¶ 28-29.) Plaintiff disputes that the failure to complete IHCPs accurately and on time was due to any fault of her own. She contends that Ms. Beck's shortcomings made her own job more difficult. (Pl. SOF ¶¶ 28-29.) On October 8, 2013, at Plaintiff's request, Ms. Beck was issued a documented verbal warning by Ms. Kelliher for failure to follow directions. Ms. Beck did not accept the contents of the warning, and issued a written rebuttal (as was her right) on October 25, 2013. (Def. SOF ¶ 31.)[2] Also on October 8, 2013, Plaintiff was issued a documented verbal warning by Ms. Kelliher for failure to complete IHCPs accurately and on time. Plaintiff disputed that this failure was due to any fault of her own, and commented that Ms. Beck's lack of cooperation had affected her ability to do her job. (*Id.* ¶ 32; Pl. SOF ¶¶ 32, 131-33.) Plaintiff asserts that this warning was not issued until October 17, 2013, which is the date she wrote when signing the acknowledgment of the warning. (Pl. SOF ¶ 130.) Defendant disputes this and points to documentary evidence from the warning notice indicating that the warning was given on October 8, 2013. (Def. Reply SOF ¶ 130; Def. SOF, Ex. 36.) Plaintiff contends that Ms. Wiblyi approved the warning, but Defendant asserts that Ms. Wiblyi did so after it was issued. (Pl. SOF ¶ 134; Def. Reply ¶ SOF 134.)

By October 11, 2013, Ms. Kelliher, Ms. Wiblyi, and Ms. McKenzie had decided Plaintiff would benefit from a more structured method of managing her time. They developed a form for

---

[2] Plaintiff disputes such a warning was issued (*see* Pl. SOF ¶ 31), but there is documentary evidence of the warning in the record. (*See* Def. SOF, Ex. 34).

Plaintiff to fill out each week identifying short- and long-term deadlines, daily priorities, and completed tasks. (Def. SOF ¶ 33.) Plaintiff submitted the form as requested, but Defendant identifies a number of instances in which Plaintiff continued to have difficulty prioritizing critical tasks over less urgent ones. For example, Plaintiff spent time preparing and circulating unnecessary drafts of notes from a conference and spent time pursuing a project to develop a dental program for students despite Ms. Kelliher and Ms. Ross indicating that such a project was not a priority. (*Id.* ¶ 34.) Plaintiff disputes this account insofar as she claims she was performing her job responsibilities well. (Pl. SOF ¶ 34.) According to Defendant, Plaintiff also displayed considerable confusion regarding how to prepare for student field trips, including confusion over what documentation and medication to bring. This gave Ms. Kelliher, Ms. Ross, and Ms. Stoddard concern over her nursing skills. (Def. SOF ¶ 35.) Plaintiff continued to have issues working with her subordinate, Ms. Beck, although the parties disagree as to how helpful Defendant's management was in attempting to resolve these issues. (*Id.* ¶¶ 36-37; Pl. SOF ¶¶ 36-37.) Defendant states that Plaintiff was not "well received by students." Ms. Ross noted that students found Plaintiff to be disruptive in class and uncomfortable to be around. (Def. SOF ¶ 38.) Plaintiff disputes this, claiming she was neither disruptive nor difficult to be around. (Pl. SOF ¶ 38.)

On October 16, 2013, Ms. Kelliher, Ms. Ross, and Ms. Wiblyi met with Plaintiff at her request. They discussed Plaintiff's continuing concerns with Ms. Beck and issues related to the distribution of medication. (Def. SOF ¶ 39.) Also on October 16, 2013, at the end of this meeting, Ms. Ross decided to place Plaintiff on a formal Performance Improvement Plan ("PIP") requiring her to improve her attention to detail, focus, accuracy in documentation, organization, knowledge of nursing laws, professional conduct, and etiquette. Ms. Ross made this decision with input from Ms. Kelliher and Ms. Stoddard, and in consultation with Ms. Wiblyi. (*Id.* ¶¶ 40-41.) Ms. Ross then drafted the PIP in consultation with Ms. Wiblyi, who provided comments to the draft. (*Id.* ¶ 42; Pl.

SOF ¶ 42.) In the meantime, Ms. Kelliher continued to note issues with Plaintiff's performance. (Def. SOF ¶ 42 n.19.)

Ms. Ross issued the PIP to Plaintiff on October 24, 2013, in the presence of Ms. Wiblyi. The PIP called for Plaintiff's improvement in the areas of concern mentioned above, put Ms. Ross in charge of monitoring Plaintiff's weekly performance, and required Plaintiff to meet with Ms. Ross and Ms. Wiblyi on a weekly basis. Plaintiff, Ms. Ross, and Ms. Wiblyi all signed the PIP, which contained an acknowledgment by Plaintiff that a formal evaluation would take place in 30 days and that any problems occurring in the meantime could result in additional action, including termination. (*Id.* ¶¶ 43-45.) Plaintiff contends that the issues raised in the PIP were untrue, but she decided it was best to just accept the PIP and "move on." (Pl. SOF ¶ 46.) Plaintiff testified that she believed the PIP was an attempt to harass her into quitting, but Defendant disputes the veracity and the accuracy of this claimed belief. (*Id.* ¶ 136; Def. Reply SOF ¶ 136.) Plaintiff asserts that certain age-related comments made by Ms. Kelliher (*e.g.*, that she did not know why Plaintiff was still working and that Plaintiff would be retired soon) were made at this meeting; Ms. Kelliher denies having made these comments, and Defendant has pointed to evidence that Ms. Kelliher was not present at this meeting. (Pl. SOF ¶¶ 114-16; Def. Reply SOF ¶¶ 114-16.)

Around 2 p.m. on Friday, October 25, 2013, Ms. Beck left the office she shared with Plaintiff to speak to faculty in the common area. A few minutes later, Plaintiff walked out of the office and left the building for the day. (Def. SOF ¶ 47.) Students were still in the building at this time. (Pl. SOF ¶ 151.) Defendant contends that, upon returning to the office, Ms. Beck noticed that the door to the office's medicine cabinet was unlocked and sitting wide open. (Def. SOF ¶ 48.) Ms. Beck called over Cheryl Tulloch, one of the faculty members she had just been talking to. Ms. Tulloch also observed the medicine cabinet standing open and unattended. (*Id.* ¶ 49.) Ms. Beck then contacted the administration to report the incident, eventually speaking with a Special Education

secretary. (*Id.* ¶ 50.) Plaintiff asserts that she did not leave the medicine cabinet open. (Pl. SOF ¶¶ 48-49.) Plaintiff asserts that the medicine cabinet only contained acetaminophen (i.e., Tylenol) and epinephrine (i.e., EpiPens), and did not contain psychotropic medications. (*Id.* ¶¶ 140, 142.) Defendant disputes this and claims, based on the testimony of Ms. Beck, that all medications were kept in the medicine cabinet. (Def. Reply SOF ¶¶ 140, 142.) Later that afternoon, Ms. Wiblyi wrote an email to Defendant's outside counsel, copying Ms. McKenzie. (Def. SOF, Ex. 59.) The following day, October 26, 2013, Ms. McKenzie replied to the email, and outside counsel followed up with a reply the day after that, October 27, 2013. (*Id.*)

On Monday, October 28, 2013, at 7:13 a.m., Ms. McKenzie emailed Ms. Wiblyi to give her "thoughts to address nursing coverage short term," one of which was to "[p]ost for an anticipated opening immediately." (*Id.*) That same day, at 9:51 a.m., Ms. Beck wrote an email to Ms. Ross and Ms. Wiblyi describing the incident. (*Id.* ¶ 51.) Ms. Ross and Ms. Wiblyi immediately traveled to the school to investigate the incident. They first met with Plaintiff and established that Plaintiff had dispensed medication prior to 2 p.m. on the previous Friday. At the conclusion of this meeting, Ms. Ross and Ms. Wiblyi informed Plaintiff that she was being placed on paid administrative leave. (*Id.* ¶¶ 52-54.) This decision was apparently made in consultation with Ms. McKenzie after she heard of the incident but prior to the beginning of the investigation, as suggested by the email Ms. McKenzie sent about how to "address nursing coverage" before the investigation began. (*Id.* ¶ 54 n.26; *id.*, Ex. 59.) Ms. Ross and Ms. Wiblyi then met with Ms. Beck, whose account was consistent with her prior email. (*Id.* ¶ 55.) Ms. Ross and Ms. Wiblyi then met with Ms. Tulloch. She stated that, after Ms. Beck left their conversation the previous Friday, Ms. Beck immediately called her over and she witnessed the medicine cabinet sitting open with its medications visible. (*Id.* ¶ 56.)

Following the investigation, Ms. Wiblyi presented the information collected and her own notes to Ms. McKenzie. (*Id.* ¶ 58.) Ms. McKenzie was not involved in the investigation itself. (Pl.

SOF ¶ 160.1.)[3] During the investigation, Ms. Wiblyi found and printed applicable regulations requiring that prescription medications be kept in securely locked cabinets used exclusively for medication. (Def. SOF ¶¶ 59-61 & n.28.) Ms. Wiblyi asserts that it would have been her normal practice to give a copy of such regulations to Ms. McKenzie and believes she did so in this case. (*Id.* ¶ 59.) Defendant asserts Ms. Wiblyi did not express a recommendation or opinion as to whether Plaintiff should be disciplined or terminated. (*Id.* ¶ 58.) In response, Plaintiff contends that Ms. Wiblyi "was also involved in the decision to terminate the Plaintiff's employment." (Pl. SOF ¶ 58.)

Ms. McKenzie stated that, in reviewing the results of the investigation, she did not credit Plaintiff's denial of leaving the medicine cabinet open because Ms. Beck's account was corroborated by Ms. Tulloch. Ms. McKenzie referred to Ms. Tulloch as a "trusted" employee who "had consistently demonstrated a logical temperament in . . . responding to problems." (Def. SOF ¶ 63.) Plaintiff concedes that Ms. Tulloch was "very pleasant" towards her and that she had no reason to believe Ms. Tulloch harbored any age bias or desire to undermine her. (*Id.* ¶ 63 n.30.) Plaintiff does point out, however, that Ms. Tulloch did not claim to have actually witnessed Plaintiff in the act of leaving the medicine cabinet open. (Pl. SOF ¶ 63.)

On October 29, 2013, Ms. Wiblyi drafted and sent Ms. McKenzie a draft termination letter and asked if Ms. McKenzie would like any changes. Ms. McKenzie did not suggest any changes and said the letter "look[ed] good." (*Id.* ¶¶ 160.2-161.2.) Defendant does not dispute this, but does dispute the inference that Ms. McKenzie had made up her mind to fire Plaintiff by this time. (Def. Reply SOF ¶¶ 160.2-161.2.) As detailed below, the parties disagree as to when the decision to terminate Plaintiff was actually made, and whether it was made by Ms. McKenzie. Defendant asserts Ms. McKenzie made the decision after receiving the investigation results and draft termination letter

---

[3] Plaintiff repeats paragraph numbers 159 through 165 in her statement of facts. To avoid confusion, the court will refer to the first set of paragraphs as 159.1 through 165.1, and the second set of paragraphs as 159.2 through 165.2.

from Ms. Wiblyi, while Plaintiff argues Ms. Wiblyi was the real decisionmaker and had made the decision before sending the draft termination letter to Ms. McKenzie.

According to Defendant, at some point after Ms. McKenzie reviewed the draft termination letter, she decided to terminate Plaintiff based on the information provided by Ms. Wiblyi and Plaintiff's prior disciplinary history. (Def. SOF ¶ 62.) Ms. McKenzie's stated rationale for terminating Plaintiff was based on the PIP (which spoke to shortcomings in Plaintiff's documentation of medical records, attention to detail, and timely completion of IHCPs) as well the medicine cabinet incident (which took place shortly after the PIP was implemented). Ms. McKenzie stated that, in coming to this decision, she evaluated the frequency of Plaintiff's violations, the short time period between the issuance of the PIP and the medicine cabinet incident, and the severity of Plaintiff's actions and the potential danger posed to students. (*Id.*)

In support of her contention that Ms. Wiblyi made the actual termination decision, Plaintiff cites evidence establishing that Ms. Wiblyi conducted the investigation, provided Ms. McKenzie with information from the investigation, and prepared the draft termination letter. (Pl. SOF ¶¶ 58, 159.1, 159.2-160.2.) Plaintiff states Ms. McKenzie "relied solely upon the information provided to her by Wiblyi when [Plaintiff's] employment was terminated." (*Id.* ¶ 163.2.) Plaintiff further argues "the evidence . . . clearly demonstrates that the decision to terminate [Plaintiff's] employment was solely that of Wiblyi and that McKenzie did nothing more in regard to that decision than sign the termination letter that Wiblyi wrote." (Dkt. No. 38, Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at 15.) Defendant disagrees with each of these contentions, arguing that Ms. McKenzie did not rely "solely" on the information provided by Ms. Wiblyi and reasserting its position that the termination decision was made by Ms. McKenzie. (Def. Reply SOF ¶ 163.2.)

On November 4, 2013, Ms. McKenzie consulted with William Fonseca, Chair of Defendant's Board of Directors. Mr. Fonseca agreed with the decision to terminate Plaintiff based

on the evidence presented. (Def. SOF ¶¶ 64-66.) Following this conversation, Ms. McKenzie informed Ms. Wiblyi that Mr. Fonseca "agree[d] that we should go ahead with the termination this week." (*Id.* ¶ 66; *id.*, Ex. 62.)

Ms. McKenzie sent a letter informing Plaintiff that her employment had been terminated. (*Id.* ¶ 67; Def. Reply SOF ¶ 162.2.) The date written on the letter is November 1, 2013 (*see* Def. SOF, Ex. 63), but the parties dispute when the letter was actually sent. Defendant states the letter was sent on November 5, 2013, after Ms. McKenzie's discussion with Mr. Fonseca. (Def. Reply SOF ¶ 162.2.) Defendant cites evidence in the form of the certified mail tracking page on the United States Postal Service website for confirmation of the November 5, 2013 date and asks the court to take judicial notice of the same. (*See* Dkt. No. 39, Def.'s Reply Mem. Supp. Mot. Summ. J. at 10 n.3.) The website only archives tracking confirmations for two years, however, meaning that while the tracking information would have been available when the parties were drafting their briefs, it is no longer on the website. As such, the court is unable to take judicial notice of the tracking information. Plaintiff asserts the letter was sent on November 1, 2013, but the only evidence she cites is the fact that the letter uses that date in its header. (Pl. SOF ¶ 162.2.) Plaintiff does not directly dispute the evidence Defendant relies upon in support of its contention that the letter was sent on November 5, 2013.

Its timing aside, the letter states that "we have determined through our investigation that this violation did occur" (in reference to the medicine cabinet incident), and Ms. McKenzie testified that "we" referred to Ms. Kelliher, Ms. Ross, Ms. Wiblyi, and herself. (*Id.* ¶ 164.2.) Defendant does not dispute this, but disputes the inference that anyone other than Ms. McKenzie made the decision to terminate Plaintiff, pointing to further testimony by Ms. McKenzie that the decision was hers to make and that no one else expressed a recommendation or opinion. (Def. Reply SOF ¶ 164.2.)

11

Plaintiff was 61 years old at the time of her termination. (Def. SOF ¶ 68.) Plaintiff never

complained to Ms. McKenzie about any age-related comments, discrimination, or harassment, and

had no reason to believe that Ms. McKenzie knew about her alleged complaints to anyone else. (*Id.* ¶

77.) Ms. McKenzie states that this is indeed the case, and further states that she did not know

Plaintiff's age when she was hired or when she was terminated. (*Id.* ¶ 78.) Christina Harrison was

hired to replace Plaintiff, and was 43 years old at the time she was hired. (Pl. SOF ¶¶ 166-67.)

### III.    STANDARD OF REVIEW

The entry of summary judgment is warranted when the evidence produced in a case shows

that "'there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.'" *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In ruling on a motion for summary judgment, the

court must "draw all reasonable inferences in the nonmovant's favor," but the court must not "draw

unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic

invective." *Id.* "If a nonmovant bears the ultimate burden of proof on a given issue, she must

present 'definite, competent evidence' sufficient to establish the elements of her claim in order to

survive a motion for summary judgment." *Id.* at 795-96 (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d

816, 822 (1st Cir. 1991)). "This is no less true in discrimination and retaliation cases where motive is

at issue; a nonmovant cannot rely 'merely upon conclusory allegations, improbable inferences, and

unsupported speculation.'" *Id.* at 796 (quoting *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855-56 (1st

Cir. 2008)).

### IV.    DISCUSSION

#### A.    Defendant's Motion to Strike

Before delving into the substantive issues, the court will resolve a procedural issue that

Defendant has raised. On June 26, 2015, Defendant filed its motion for summary judgment,

memorandum of law, and statement of facts. (Dkt. Nos. 27-29.) On August 8, 2015, after receiving extensions from the court, Plaintiff filed her opposition memorandum and statement of facts. (Dkt. Nos. 37-38.) On August 28, 2015, Defendant filed its reply memorandum and statement of facts. (Dkt. Nos. 39-40.) On October 2, 2015, after receiving permission and an extension from the court, Plaintiff filed a sur-reply memorandum. (Dkt. No. 46.) The hearing on the motion for summary judgment was held on October 15, 2015. (Dkt. No. 47.) On October 30, 2015, Defendant filed a motion to strike Plaintiff's sur-reply, which Plaintiff opposed on November 13, 2015. (Dkt. Nos. 49-50.)

　　　　In support of its motion to strike, Defendant argues the sur-reply was procedurally and substantively improper because it purported to set forth additional facts and pieces of evidence, even though the time for additions to the factual record for summary judgment had ended. It is true that the sur-reply, perhaps because the question of Ms. Wiblyi's involvement in the decision to terminate Plaintiff is a crucial issue, is mostly concerned with framing facts to support Plaintiff's view on this point. It does so largely by characterizing (or recharacterizing) facts that were already addressed by each party in their previous submissions. Perhaps more troublingly, the sur-reply includes a new declaration by Plaintiff and two exhibits that were apparently not produced in discovery. But the affidavit and one of the exhibits relate to a doctor's note Plaintiff received after being placed on administrative leave, which is not a material issue. The other exhibit is a screenshot from Defendant's own website regarding the posting of an anticipated opening for a nursing position, an issue that was already thoroughly discussed in the record and during oral argument. In addition to reframing the facts on the record, the sur-reply briefly argues regarding the case law surrounding the so-called "cat's paw" theory of discrimination and retaliation, which was already the subject of briefing and argument in prior filings.

Thus, it would be a stretch to say the sur-reply "seek[s] essentially to place before the court asserted facts to which [Defendant] cannot respond," *Mitsubishi Caterpillar Forklift Am., Inc. v. Superior Serv. Assocs., Inc.*, 81 F. Supp. 2d 101, 106 n.2 (D. Me. 1999), or "raise[s] a new argument" instead of "clarify[ing] arguments previously made." *Johnson v. Indymac Mortg. Servicing*, No. 12-cv-10808-MBB, 2014 WL 1652594, at *5 n.14 (D. Mass. Apr. 22, 2014). The court is therefore not persuaded that the sur-reply should be stricken on procedural or substantive grounds. For the same reasons, however, the court notes that the assertions contained in the sur-reply do not meaningfully change the record, thereby limiting its usefulness. Defendant has also moved the court to order sanctions against Plaintiff for failure to produce the documents relating to her doctor's note and the anticipated nursing position opening, which were attached to the sur-reply. But, as noted above, the doctor's note is immaterial and the job posting screenshot, which comes from a website under Defendant's control, merely relates to a factual issue that the parties have previously addressed. The court is thus not convinced that striking the sur-reply or imposing other sanctions would be appropriate. Finally, because the court declines to strike the sur-reply, it will also deny Defendant's request for costs related to the motion to strike. The motion to strike is denied in its entirety.

**B.     Age Discrimination (Counts I and IV)**

Both the ADEA and Chapter 151B prohibit employers from terminating employees aged 40 or older on the basis of their age. 29 U.S.C. §§ 623(a)(1), 631(a); Mass. Gen. Laws ch. 151B, §§ 1, 4(1B). To prove such a claim, an employee must prove that age was the "but-for" or "determinative" cause of the termination decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Lipchitz v. Raytheon Co.*, 751 N.E.2d 360, 370-71 (Mass. 2001). The employee may do so via direct evidence of age discrimination; that is, "'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" *Patten v. Wal-Mart Stores East, Inc.*, 300 F.3d 21, 25 (1st Cir. 2002) (quoting *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60

(1st Cir. 2000)). Defendant contends, and Plaintiff appears to concede, that Plaintiff cannot prove

her claim via direct evidence of age discrimination. In the absence of such direct evidence, Plaintiff

must prove her claim based on circumstantial evidence using the three-step, burden-shifting

framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Patten*, 300 F.3d

at 24; *Haddad v. Wal-Mart Stores, Inc.*, 914 N.E.2d 59, 66 & n.14 (Mass. 2009).[4] Step one requires

Plaintiff to make out a *prima facie* case of discrimination. If she does so, an inference of

discrimination arises and, at step two, the burden shifts to Defendant to articulate a legitimate,

nondiscriminatory reason for the termination. If it is able to do so, the burden shifts back to

Plaintiff, who, at step three, must show that Defendant's proffered reason was merely a pretext for

discrimination.

   1.   <u>*McDonnell Douglas* Step One – *Prima Facie* Case</u>

   At the first step, Plaintiff must make out a *prima facie* case of age discrimination by

establishing that (1) she was over the age of 40 when terminated, (2) her work was "sufficient to

meet [Defendant's] legitimate expectations," (3) she suffered an adverse employment action, and (4)

Defendant sought or hired "a replacement with roughly equivalent job qualifications, thus revealing

a continued need for the same services and skills." *Mesnick*, 950 F.2d at 823; *see also Adamson v.

Walgreens Co.*, 750 F.3d 73, 78 (1st Cir. 2014). "[T]he burden of making out a *prima facie* case is not

onerous." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 844 (1st Cir. 1993).

   The parties agree that Plaintiff has met elements (1), (3), and (4) of her *prima facie* case, but

they disagree as to element (2), whether Plaintiff's work was sufficient to meet Defendant's

legitimate expectations. Defendant asserts that Plaintiff cannot show that her work met its

expectations and cites numerous and significant examples of alleged subpar performance to

---

[4] "Massachusetts generally analyzes discrimination claims using the same guidelines as set forth under federal law." *Liljestrand v. First Allmerica Fin. Life Ins. Co.*, No. 022574A, 2004 WL 3152406, at *3 (Mass. Super. Dec. 21, 2004).

demonstrate this. Plaintiff, on the other hand, contends that "there are clearly material facts in dispute as to whether [Defendant] performed her job functions at an acceptable level in all respects and that she did not leave the medicine cabinet open." (Pl.'s Mem. at 7.)

Defendant provides evidence of continuous concern over Plaintiff's job performance from almost the beginning of her tenure. Plaintiff's contention that she was performing her job adequately is based primarily on her own self-evaluation, which she makes in a conclusory fashion and without pointing to any supporting evidence outside of her own deposition and affidavits. In other words, between the initial filing of Plaintiff's complaint and the current stage of the litigation, it appears that no outside evidence has been produced that corroborates her assertion of adequate job performance. Therefore, it might be arguable that Plaintiff has not shown a genuine issue of material fact exists regarding the sufficiency of her work. But Plaintiff does dispute Defendant's assertions, and her position is based on her own appraisal of the situation that she witnessed and participated in. Moreover, Plaintiff alleges that discriminatory comments occurred as early as her hiring interview with Ms. McKenzie, even though Defendant denies these accusations. Bearing in mind that Plaintiff's burden at this stage is light, and drawing all inferences in her favor as the nonmovant, Plaintiff has satisfied her burden of making out a *prima facie* case of discrimination.

2.      *McDonnell Douglas* Step Two – Legitimate, Nondiscriminatory Reason

Since Plaintiff has made out a *prima facie* case of age discrimination, an inference of unlawful discrimination arises and the burden shifts to Defendant to provide a legitimate, nondiscriminatory reason for terminating her. *Mesnick*, 950 F.2d at 823. "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times."[5] *Id.*

---

[5] Plaintiff argues courts should not credit evidence offered by the defendant to demonstrate a legitimate, nondiscriminatory reason for termination when the same evidence was offered to oppose the plaintiff's *prima facie* showing that the defendant's legitimate expectations were not met. This is a misreading of the relevant case, *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 24 (1st Cir. 2015). In that case, the First Circuit

Defendant points to evidence of Plaintiff's unsatisfactory job performance in numerous areas, including her allegedly poor documentation of health records, alleged difficulty completing IHCPs accurately and on time, and the medicine cabinet incident. Ms. McKenzie stated these factors formed the basis of the decision to terminate Plaintiff. Based on this evidence, Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.

        3.     *McDonnell Douglas* Step Three – Pretext

Because Defendant has articulated a legitimate, nondiscriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to demonstrate that this reason was merely a pretext for age discrimination. At this stage, the federal and state standards differ. Under the ADEA, Plaintiff must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Mesnick*, 950 F.2d at 824. Under Chapter 151B, Plaintiff need only point to evidence that would enable a reasonable jury to conclude that the given reason is false. *Haddad*, 914 N.E.2d at 66. That is to say, Plaintiff has an easier burden under Chapter 151B because she is not required to prove "that the reason was given to cover a discriminatory animus." *Lipchitz*, 751 N.E.2d at 367.[6] Under either standard, though, Plaintiff must demonstrate pretext by showing that Defendant's legitimate, nondiscriminatory reason for terminating her was false.

---

stated that evidence of a nondiscriminatory reason cannot be the sole evidence relied upon to defeat the *prima facie* showing, because that would deprive plaintiffs of their opportunity to show pretext. *Id.*

In other words, Plaintiff argues evidence from step one should not be credited at step two. But the First Circuit has only held that evidence from step two should not be credited at step one, because that would prevent plaintiffs from getting to step three. It does not follow that it goes both ways, as Plaintiff contends, because allowing evidence from step one to be used at step two would not prevent plaintiffs from making a showing at step three.

[6] The court notes that the difference between the federal and state standards may not be material in this case. While the Massachusetts standard only requires Plaintiff to show that Defendant's proffered reasons for termination were false, that is where the bulk of the dispute lies. The parties' dispute centers on whether the shortcomings in performance that Defendant alleges were the real reason that Plaintiff was fired. This case thus has less to do with whether there was a "cover up" by Defendant to hide its true purpose of age discrimination.

"To defeat a motion for summary judgment," Plaintiff need only show that her ability to meet her burden of proving pretext "turns on a genuine issue of material fact." *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 23 (1st Cir. 2015). And the First Circuit has warned that, once a plaintiff makes out a *prima facie* case of discrimination and the issue becomes pretext, "courts must be 'particularly cautious' about granting the employer's motion for summary judgment." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) (quoting *Stepanischen v. Merchs. Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983)). At the same time, a plaintiff's mere denial of an employer's proffered reasons is insufficient for such plaintiff to "establish triable issues of fact foreclosing summary judgment"; to hold otherwise would "spell the end of summary judgment." *Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R.*, 404 F.3d 42, 45 (1st Cir. 2005). The issue "is not whether reasonable jurors could find that [Defendant] lacked good cause to terminate . . . but, rather, whether [Plaintiff] made a substantial showing that the reason given for the termination was false." *Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000). To do so, Plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" that a "reasonable factfinder could rationally find them unworthy of credence." *Gómez-González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662-63 (1st Cir. 2010). She may also point to "comments by the employer which intimate" a discriminatory mindset. *Mesnick*, 950 F.2d at 828. The evidence must be "adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 57 (1st Cir. 1999).

The focus, however, remains on the mindset of the decisionmaker who decided to fire Plaintiff and "whether the employer believed its stated reason to be credible." *Mesnick*, 950 F.2d at 824. The question is not whether the employer was incorrect or mistaken, but whether the employer actually believed that its stated reason was its real reason at the time it made the decision. *Ronda-*

*Perez*, 404 F.3d at 45. To refute the employer's stated belief, the employee's evidence "must be of such strength and quality as to permit a reasonable finding that the [termination] was obviously or manifestly unsupported." *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir. 1997). More specifically, when "the employer's reason for termination is based on the results of an investigation into alleged misconduct by the plaintiff, the inquiry is not whether the plaintiff's version of events is true, but whether the decision-maker reasonably believed that the plaintiff had engaged in misconduct." *Bennett v. Saint-Gobain Corp.*, 453 F. Supp. 2d 314, 327 (D. Mass. 2006), *aff'd* 507 F.3d 23 (1st Cir. 2007). When the decision to hire and to fire was made by the same person in a short period of time, a "strong inference exists that discrimination was not a determining factor." *Pina*, 740 F.3d at 796 n.10. However, an issue raised in this case is whether the same person who made the decision to hire actually was the one responsible for the decision to fire.

If Ms. McKenzie indisputably made the decision to terminate Plaintiff, then Defendant would have a stronger argument for summary judgment. The evidence shows that Ms. McKenzie's purported reasons for terminating Plaintiff were Plaintiff's repeated performance shortcomings and the incident involving the medicine cabinet. With respect to the medicine cabinet incident, Plaintiff has failed to set forth sufficient evidence to challenge Defendant's contention that Ms. McKenzie reasonably believed Plaintiff was at fault because of the corroborating account of Ms. Tulloch, a trusted employee who Plaintiff concedes had no apparent bias against her. Moreover, Plaintiff has not pointed to sufficient evidence demonstrating that Ms. McKenzie did not believe her stated reasons for terminating Plaintiff, namely, Plaintiff's misconduct and otherwise inadequate work performance.

But Ms. McKenzie is alleged to have made age-related comments during the hiring interview, even though she denies doing so, leading to a tepid factual dispute. Ms. McKenzie's hiring of Plaintiff implicates the "strong inference" against discrimination when the decision to hire and fire

was made by the same person in a short span of time. However, the court finds this "strong inference" in Defendant's favor is marginally, but sufficiently, offset by the dispute over Ms. McKenzie's alleged comments at the hiring interview.

Plaintiff asserts Ms. Wiblyi made the actual decision to terminate her and simply received a rubber stamp from Ms. McKenzie. If this were the case, it would further weaken Defendant's argument for summary judgment. Though denied by Defendant, Plaintiff alleges Ms. Wiblyi made age-related comments to her and chose not to follow up on her claims of age-related comments made by others. Plaintiff argues this discriminatory behavior, the occurrence of which presents its own issue of material fact, reveals Ms. Wiblyi's motivation to terminate her. According to Plaintiff, Ms. Wiblyi then controlled the investigation into the medicine cabinet incident and was thereby able to have Plaintiff fired. Of course, Defendant disputes all this and relies on evidence tending to cast doubt on Plaintiff's version of events; but genuine issues of fact, with varying degrees of materiality, remain.

In support of her contention that Ms. Wiblyi made the termination decision, Plaintiff points out that Ms. Wiblyi conducted the investigation following the medicine cabinet incident and found the regulations that Plaintiff was said to have violated. Additionally, the findings of Ms. Wiblyi's investigation formed the basis of Ms. McKenzie's formal termination decision, although the parties dispute whether the findings provided the "sole" basis for the determination. Moreover, the record shows that Ms. Wiblyi drafted the termination letter, which Ms. McKenzie approved without making any changes. Finally, the termination letter states that "we have determined" the medicine cabinet incident occurred, and Ms. McKenzie stated that "we" referred to herself and others, including Ms. Wiblyi, although the parties predictably disagree over how to characterize this statement.

For its part, Defendant relies on Ms. McKenzie's testimony that she made the sole decision, her detailed rationale for making the decision, the fact that she discussed the termination with Mr.

Fonseca, and the fact that she signed the termination letter and emailed Ms. Wiblyi the "go-ahead" for it to be sent. Defendant also argues that the termination letter was sent on November 5, 2013, thereby showing the letter was not sent until after Ms. McKenzie spoke to Mr. Fonseca, which supports the inference that the decision rested with Ms. McKenzie.[7] Defendant also disputes that Plaintiff's evidence shows Ms. Wiblyi to be the decisionmaker. For example, Defendant asserts Ms. Wiblyi drafted the termination letter simply because that was her job as Director of Human Resources.

The relative strength of these positions is up for debate, and the court, recognizing the admonition to be "particularly cautious" at the summary judgement stage once pretext is at issue, finds that there remain genuine issues of material fact regarding who made the termination decision and whether such decisionmaker's proffered reasons for the termination were pretextual. Accordingly, Defendant's motion for summary judgment on Counts I and IV is denied.

## C.      Age Harassment (Counts II and V)

Both the ADEA and Chapter 151B prohibit employers from discriminating against employees aged 40 or older with respect to the conditions of their employment on the basis of age, including by creating a hostile work environment. 29 U.S.C. §§ 623(a)(1), 631(a); Mass. Gen. Laws ch. 151B, §§ 1, 4(1B). Under both statutes, an employee claiming to have been the victim of such an environment must prove that his workplace was "'permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Trent v. ADT Sec. Servs., Inc.*, No. 11-cv-

---

[7] Plaintiff argues the termination letter was sent on November 1, 2013, which would tend to cast doubt on Defendant's version of the timeline. But, even though Defendant's cited evidence from the United States Postal Service website is no longer available, Plaintiff does not challenge Defendant's reliance upon this evidence, nor does Plaintiff dispute the existence of Ms. McKenzie's November 4, 2013 email relating to the "go-ahead" to terminate Plaintiff. Instead, Plaintiff simply asserts the correct date is November 1, 2013, based on the letter's header, without disputing the contrary evidence Defendant has set forth. This is insufficient to articulate a dispute under Federal Rule of Civil Procedure 56(c).

11912-RGS, 2013 WL 4512052, at *6 (D. Mass. Aug. 22, 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Prescott v. Higgins*, 538 F.3d 32, 42 (1st Cir. 2008) ("Under Massachusetts law, a hostile work environment is one that is pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [such that it] poses a formidable barrier to the full participation of the individual in the workplace."). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" to establish an objectively hostile or abusive work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

"In determining whether an environment is sufficiently 'hostile' or 'abusive,' a court should examine all of the surrounding circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Trent*, 2013 WL 4512052, at *6 (quoting *Harris*, 510 U.S. at 23). This list of circumstances is not exhaustive, however, and "no single factor is required." *Harris*, 510 U.S. at 23. The inquiry is both subjective and objective; the employee must have actually believed that the work environment was hostile and must be able to convince a reasonable jury that a rational employee would have felt the same way. *See Douglas v. J.C. Penney Co.*, 422 F. Supp. 2d 260, 280 (D. Mass. 2006). "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 23).

In this case, Plaintiff has not raised a genuine issue of material fact as to the existence of a hostile work environment. It is true that Plaintiff makes a number of allegations of discriminatory age-related comments and that Defendant disputes all of these allegations. But, even taking Plaintiff's allegations to be true, the comments, while offensive, do not rise to the level of severity to

meet the standard of a hostile work environment. While "no single factor is required," the comments cannot fairly be viewed as meeting any of the factors articulated in *Harris*, with the possible exception of frequency. That is to say, judging the comments in the light most favorable to Plaintiff's case, they could be viewed as somewhat frequent, but they do not rise to the level of being severe, being physically threatening or humiliating, or having unreasonably interfered with Plaintiff's work performance. The evidence does not permit a reasonable jury to find that a reasonable employee would have viewed this as a hostile work environment. Therefore, summary judgment is granted for Defendant on Counts II and V.

> **D.      Retaliation (Counts III and VI)**

Both the ADEA and Chapter 151B prohibit employers from taking adverse action against an employee who has "opposed any practice" that is prohibited under those statutes. 29 U.S.C. § 623(d); Mass. Gen. Laws ch. 151B, § 4(4). In the absence of direct evidence of a retaliatory motive, such claims are also governed by the *McDonnell Douglas* framework. Under both the ADEA and Chapter 151B, to make out a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two. *Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc.*, 425 F.3d 67, 84 (1st Cir. 2005); *Mole v. Univ. of Mass.*, 814 N.E.2d 329, 338-39 (Mass. 2004). The parties agree that Plaintiff suffered an adverse employment action, and Defendant concedes (solely for the purposes of its motion for summary judgment) that there is a genuine dispute of material fact regarding whether Plaintiff engaged in protected conduct by complaining of age-related comments to Ms. Wiblyi. Thus, the only issue at this stage is whether Plaintiff can show a causal connection between her alleged protected conduct and her termination. To do so, Plaintiff must either demonstrate that the decisionmaker had actual knowledge of the protected activity or that the so-called "cat's paw" theory applies. See *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015).

With respect to causal connections based on actual knowledge, while "an inference of causation is permissible" if "adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity," the fact "[t]hat an employer knows of a discrimination claim and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation." *Mole*, 814 N.E.2d at 339. When "adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are motivated by retaliation." *Id.* at 340.

"The 'cat's paw theory' is employed when one seeks 'to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Ameen*, 777 F.3d at 68 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). Under one formulation of this theory, "corporate liability can attach when neutral decisionmakers rely on information that is manipulated by another employee who harbors illegitimate animus." *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 86 (1st Cir. 2004). In the alternative, the Supreme Court has held "cat's paw" liability may attach "if a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action," although the Supreme Court "express[ed] no view" regarding whether liability could be found "if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Staub*, 562 U.S. at 422 & n.4.

Unlike with her discrimination claims, Plaintiff has not articulated a genuine issue of material fact over her retaliation claims, regardless of who made the termination decision. If Ms. McKenzie made the decision, then there is no genuine issue of material fact and summary judgment would be warranted. It is undisputed that Plaintiff never complained to Ms. McKenzie about any age-related

comments, discrimination, or harassment, and had no reason to believe that Ms. McKenzie knew

about her alleged complaints to anyone else. This would entirely sever the causal connection based

on actual knowledge.[8] If Ms. Wiblyi was the decisionmaker, then there is still no genuine issue of

material fact with respect to retaliation. Ms. Wiblyi's alleged comments when Plaintiff sought to

bring a complaint in early October may reveal a discriminatory mindset, but they do not support a

finding of retaliatory motives distinct from discriminatory ones. Intervening events, especially the

medicine cabinet incident, may or may not help Plaintiff show discriminatory action by Ms. Wiblyi,

but they further weaken the causal connection between Plaintiff's alleged complaints to Ms. Wiblyi

and her termination. Additionally, given these intervening events and the fact that Ms. Wiblyi was

aware of concerns over Plaintiff's performance as early as September 19, 2013, the court cannot

draw an inference of causation based on the timing of Plaintiff's alleged complaints and her

termination. *See Mole*, 814 N.E.2d at 339-40. In short, Plaintiff has produced enough evidence to

allow a reasonable jury to find Ms. Wiblyi terminated her because of discriminatory motives, but she

has not put forth enough evidence to support a separate finding of retaliatory action by Ms. Wiblyi.

Therefore, Defendant's motion for summary judgment on Counts III and VI is allowed.

---

[8] The court notes the parties' dispute over use of the "cat's paw" theory. Because this theory deals with situations involving a neutral decisionmaker who is influenced by someone else with discriminatory animus, use of the theory must presume that Ms. McKenzie was the decisionmaker. Under the *Cariglia* formulation, the theory does not apply, because the record shows Ms. Wiblyi presented both sides of the story when providing the results of her investigation, and there is no evidence that she "manipulated" the information. The parties dispute whether the *Staub* version of the theory is applicable, because that case was decided under a different statute than the ADEA, but it does not help Plaintiff in any event. Assuming Ms. McKenzie made the termination decision, as the court must in order to entertain the "cat's paw" theory, it is undisputed that Ms. McKenzie relied on an investigation report that presented the perspectives of all individuals involved in the medicine cabinet incident. Ms. Wiblyi's alleged bias cannot be said to have influenced the decision if she reported all sides of the story and left the ultimate decision up to Ms. McKenzie.

## V. Conclusion

For the reasons set forth above, Defendant's motion to strike Plaintiff's sur-reply (Dkt. No. 49) is DENIED, Defendant's motion for summary judgment (Dkt. No. 27) is DENIED with respect to Counts I and IV, and Defendant's motion for summary judgment is ALLOWED with respect to Counts II, III, V and VI. The clerk shall schedule a final pretrial conference and trial dates for this matter.

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge